## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICIA BETTGER,** | : | **CIVIL ACTION NO. 1:13-CV-2030** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CROSSMARK, INC.,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Presently before the court is the joint motion (Doc. 55) of plaintiff Patricia Bettger ("Bettger") and of defendant Crossmark, Inc. ("Crossmark") for judicial approval of settlement, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* For the reasons that follow, the court will grant the motion in part and deny it in part.

### I.    Factual Background & Procedural History

Crossmark is a provider of in-store marketing and retail merchandising services for consumer products such as Frito-Lay, General Mills, Fuji Film, Johnson & Johnson and Kraft Foods.  (Doc. 1 ¶ 3).  Bettger has been an hourly-paid retail representative for Crossmark since 1999.  (Id. ¶ 2).  Bettger worked full-time for Crossmark during 2008 and early 2009, but Crossmark switched her to a part-time schedule effective as of the March 27, 2009 pay period.  (Doc. 28 ¶ 2; Doc. 31 at 5-6 ¶ 2; Doc. 33 ¶ 2).  Bettger performs most of her work duties at various store locations in Pennsylvania.  (Doc. 1 ¶ 16).  During her period of full-time employment, Bettger began her day by connecting to Crossmark's website from her

personal computer at home to check email and to receive instructions on work assignments.  (Id. ¶¶ 17-18).  Bettger was not specifically required to connect to Crossmark's website from her home, and she could have connected from any internet-accessible computer device.  (Doc. 28 ¶ 16; Doc. 31 at 19 ¶ 16; Doc. 33 ¶ 16).  Bettger also spent approximately twenty minutes each morning loading her car with work materials.  (Doc. 1 ¶ 23).  After loading her car, Bettger departed home for her first assigned work location.  (Id. ¶ 24).  She used her personal vehicle to drive to assigned stores, and Crossmark did not require her to clean or perform maintenance on her vehicle.  (Doc. 28 ¶ 18; Doc. 31 at 20 ¶ 18; Doc. 33 ¶ 18).  Crossmark paid Bettger for her morning commute only when she exceeded the established benchmarks of forty miles or one hour.  (Doc. 28 ¶ 20; Doc. 31 at 21 ¶ 20; Doc. 33 ¶ 20).

Bettger exercised substantial discretion over her daily work schedule.  She decided which assigned stores to visit on which days, and in what order to visit them.  Crossmark only required that Bettger perform certain assignments on a particular day of the week and that she complete all assignments within a two-week time frame.  (Doc. 28 ¶ 15; Doc. 31 at 19 ¶ 15; Doc. 33 ¶ 15).

Bettger recorded her work hours in Crossmark's online SalesTrak system.  (Doc. 28 ¶ 6; Doc. 31 at 7 ¶ 6; Doc. 33 ¶ 6).  Other than payroll support staff, only Bettger could enter her time or modify her entries in SalesTrak.  (Doc. 28 ¶ 7; Doc. 31 at 7 ¶ 7; Doc. 33 ¶ 7).  Aside from the time reports submitted into SalesTrak, neither Crossmark nor Bettger has any record of Bettger's work hours.  (Doc. 28

¶ 10; Doc. 31 at 11 ¶ 10; Doc. 33 ¶ 10).  It is undisputed that Bettger was paid for all the time that she reported in SalesTrak.  (Doc. 28 ¶ 8; Doc. 31 at 8-10 ¶ 8; Doc. 33 ¶ 8).

Crossmark's written policy requires Bettger to record accurately the time she worked in the SalesTrak system.  (Doc. 28 ¶ 11; Doc. 31 at 11-13 ¶ 11; Doc. 33 ¶ 11).  It also instructs Bettger to report the actual amount of time she spent on administrative tasks, and not to use a "rule of thumb" by estimating 15 or 30 minutes per day for such tasks.  (Doc. 28 ¶ 12; Doc. 31 at 13-15 ¶ 12; Doc. 33 ¶ 12).  The written policy further states that supervisors are not allowed to "suggest" that employees work extra time without reporting it.  (Doc. 28 ¶ 13; Doc. 31 at 15-17 ¶ 13; Doc. 33 ¶ 13).  Additionally, the policy prohibits employees from working overtime without advance approval.  (Doc. 28 ¶ 14; Doc. 31 at 17-19 ¶ 14; Doc. 33 ¶ 14).  If an employee works unapproved overtime, they will be paid but they may be subject to discipline for non-compliance.  (Id.)

The parties dispute whether Bettger's supervisor, Jane Swaggert ("Swaggert"), instructed Bettger consistent with this written policy.  According to Bettger, Swaggert periodically advised her: "we have to keep the week under 40 hours unless there's an exception."  (Doc. 31-1, Ex. 1 at 134:23-24).  When Bettger informed Swaggert that she was working more time than she was allowed, Swaggert allegedly responded, "Well, my hands are tied.  You can only—you can't put that in."  (Doc. 31-1, Ex. 1 at 190:5-8).  Significantly, however, Bettger does not recall whether Swaggert instructed her to keep her reported weekly hours under 40 even if she actually worked more than 40 hours, or simply advised her to get her

3

work done within 40 hours.  (Doc. 28 ¶ 37; Doc. 31 at 31 ¶ 37; Doc. 33 ¶ 37; Doc. 31-1, Ex. 1 at 138:9-19).  On at least six occasions during her period of full-time employment in 2008 and early 2009, Bettger reported and was paid for overtime.  (Doc. 28 ¶ 29; Doc. 31 at 25-26 ¶ 29; Doc. 33 ¶ 29).

Bettger also alleges that Swaggert orally instructed her to limit her administrative time to 30 minutes a day or 2.5 hours a week.  (Doc. 28 ¶ 31; Doc. 31 at 26 ¶ 31; Doc. 33 ¶ 31).  She estimates that during her full-time employment in 2008 and early 2009, she performed administrative tasks for 5.5 to 8 hours per week that she did not report and for which she was not paid.  (Doc. 28 ¶ 27; Doc. 31 at 25 ¶ 27; Doc. 33 ¶ 27).  However, Swaggert never threatened Bettger with termination for entering more than 30 minutes of administrative time in a single day, and Bettger had not heard of other employees being terminated for that reason.  (Doc. 28 ¶ 34; Doc. 31 at 29 ¶ 34; Doc. 33 ¶ 34).  Indeed, she entered more than 30 minutes a day or 2.5 hours a week of administrative time into SalesTrak on numerous occasions in 2008, and was paid in full each time.  (Doc. 28 ¶ 33; Doc. 31 at 28-29 ¶ 33; Doc. 33 ¶ 33).  Furthermore, it is undisputed that Bettger never complained to anyone in Crossmark's Payroll or Human Resources Departments, or to corporate headquarters, about Swaggert's alleged instructions.  (Doc. 28 ¶ 35; Doc. 31 at 29-30 ¶ 35; Doc. 33 ¶ 35).

On February 9, 2011, Bettger filed a consent form to join the putative collective action Postiglione *et al.* v. Crossmark, Inc., Civ. A. No. 11-960, in the Eastern District of Pennsylvania.  Plaintiffs in that action sought to certify a nationwide class of Crossmark Retail Representatives for violations of § 216(b) of

the FLSA based on allegations of unpaid overtime.  On November 15, 2012, the court denied the <u>Postiglione</u> plaintiffs' motion for conditional collective action certification, holding that (1) plaintiffs were not similarly situated and (2) plaintiffs failed to establish an illegal company-wide policy on behalf of Crossmark.  Civ. A. No. 11-960, 2012 WL 5829793 (E.D. Pa. Nov. 15, 2012).  The court also found that Bettger was improperly joined to the action because plaintiffs' claims did not rise out of a common transaction or occurrence.  (<u>Id.</u>)

On January 24, 2013, Bettger filed an individual complaint in this case in the Eastern District of Pennsylvania.  (Doc. 1).  On June 27, 2013, the Eastern District of Pennsylvania entered an order transferring Bettger's case to the Middle District of Pennsylvania.  (Doc. 13).  After a period of discovery, Crossmark filed a motion (Doc. 26) for summary judgment and a motion (Doc. 34) *in limine*.  The court granted Crossmark's motion for summary judgment in part, limiting the scope of Bettger's claims for unpaid overtime compensation to the unreported hours she allegedly spent performing administrative tasks.  (Doc. 38).  The court granted Crossmark's motion *in limine* in full, precluding Bettger from introducing evidence relating to (1) other FLSA lawsuits against Crossmark and (2) Crossmark's failure to maintain login and logout records from SalesTrak.  (<u>Id.</u>)

Before proceeding to trial, the parties agreed to settle the case.  (Doc. 55 ¶¶ 9-10).  The court subsequently ordered the parties to file any proposed settlement agreement for judicial approval.  (Doc. 48).  On November 30, 2014, Bettger filed a motion (Doc. 52) for judicial approval of settlement, and on December 12, 2014, the

parties submitted the instant proposed settlement agreement accompanied by a brief in support.  (See Doc. 55).  The motion is fully briefed and ripe for disposition.

## II.    Legal Standard

Congress enacted the FLSA for the purpose of "protect[ing] all covered workers from substandard wages and oppressive working hours."  Barrentine v. Arkansas-Best Freight Sys., 450 U.S. 728, 739 (1981); see also 29 U.S.C. § 202(a).  The statute was designed to ensure that each employee covered by the Act would receive "[a] fair day's pay for a fair day's work and would be protected from the evil of overwork as well as underpay."  Barrentine, 450 U.S. at 739 (internal citations and quotations omitted).  To safeguard employee rights made mandatory by the statute, a majority of courts have held that bona fide FLSA disputes may only be settled or compromised through payments made under the supervision of the Secretary of the Department of Labor or by judicial approval of a proposed settlement in an FLSA lawsuit.  See, e.g., Lynn's Food Stores, Inc. v. U.S. ex rel. U.S. Dep't of Labor, 679 F.2d 1350, 1354 (11th Cir. 1982) ("[W]hen the parties submit a settlement to the court for approval, the settlement is more likely to reflect a reasonable compromise of disputed issues than a mere waiver of statutory rights brought about by an employer's overreaching."); Copeland v. ABB, Inc., 521 F.3d 1010 (8th Cir. 2008); O'Connor v. United States, 308 F.3d 1233, 1243-44 (Fed. Cir. 2002); Dees v. Hydradry, Inc., 706 F. Supp. 2d 1227 (M.D. Fla. 2010); Collins v. Sanderson Farms, Inc., 568 F. Supp. 2d 714 (E.D. La. 2008).  But see Martin v. Spring Break '83 Prods., 688 F.3d 247 (5th Cir. 2012).  Under § 216(b), an employer who violates § 206 or § 207 is liable to the affected employee or employees for

unpaid minimum or overtime compensation, and for an additional equal amount in liquidated damages.  29 U.S.C. § 216(b).  Although the Third Circuit has not addressed whether such § 216(b) actions claiming unpaid wages may be settled privately without first obtaining court approval, district courts within the Third Circuit have followed the majority position and assumed that judicial approval is necessary.  See, e.g., McGee v. Ann's Choice, Civ. A. No. 12-2664, 2014 WL 2114582 (E.D. Pa. June 4, 2014); Brown v. TrueBlue, Inc., No. 1:10-CV-514, 2013 WL 5408575 (M.D. Pa. Sept. 25, 2013); Deitz v. Budget Renovations & Roofing, Inc., No. 4:12-CV-0718, 2013 WL 23338496 (M.D. Pa. May 29, 2013); Altenbach v. Lube Ctr., No. 1:08-CV-2178, 2013 WL 74251 (M.D. Pa. Jan. 4, 2013); Cuttic v. Crozer-Chester Med. Ctr., 868 F. Supp. 2d 464 (E.D. Pa. 2012); Brumley v. Camin Cargo Control, Inc., Civ. A. No. 08-1798, 2012 WL 1019337 (D.N.J. Mar. 26, 2012); Morales v. PepsiCo, Inc., Civ. A. No. 11-6275, 2012 WL 870752 (D.N.J. Mar. 14, 2012).  In the absence of guidance from the Third Circuit, courts have routinely employed the considerations set forth by the Eleventh Circuit in Lynn's Food Stores, 679 F.2d 1350, to evaluate proposed settlement agreements.  See, e.g., McGee, 2014 WL 2114582; Brown, 2013 WL 5408575; Deitz, 2013 WL 23338496; Altenbach, 2013 WL 74251; Cuttic, 868 F. Supp. 2d 464; Brumley, 2012 WL 1019337; Morales, 2012 WL 870752.

Under Lynn's Food Stores, 679 F.2d 1350, a proposed compromise may satisfy judicial review if it is a "fair and reasonable resolution of a *bona fide* dispute over FLSA provisions."  Id. at 1355.  An agreement resolves a *bona fide* dispute when there is some doubt as to whether the plaintiff would succeed on the merits at trial.  See id. at 1354; Deitz, 2013 WL 23338496, at *3; Collins, F. Supp. 2d at 719-20.

Disputed issues may include, for example, "FLSA coverage or computation of back wages." Lynn's Food Stores, 679 F.2d at 1354; see Brown, 2013 WL 5408575, at *1. If a reviewing court is satisfied that an agreement does in fact decide a *bona fide* dispute, it proceeds in two phases: first, the court assesses whether the agreement is fair and reasonable to the plaintiff employee; second, it determines whether the settlement furthers or "impermissibly frustrates" the implementation of the FLSA in the workplace. Altenbach, 2013 WL 74251, at *1; see McGee, 2014 WL 2114582, at *2; Brown, 2013 WL 5408575, at *1; Dees, 706 F. Supp. 2d at 1241.

### III.   Discussion

#### A.   Terms of Proposed Agreement

Under the terms of the proposed settlement agreement, Bettger will receive $3,298.55 for unpaid wages and $3,298.55 for liquidated damages, $6,597.09 in total. (Doc. 55 Ex. C ¶ 2.1). Bettger's counsel will receive $16,502.90 for attorneys' fees and costs. (Id.) Regarding these payments, the agreement specifically states:

> [Crossmark's payments] shall constitute consideration and payment in full for (i) all claims Bettger has or may have against [Crossmark]; (ii) any and all attorneys' fees, expenses, costs of court and any other unknown fees, costs and/or expenses incurred by Bettger and/or her legal counsel . . . and (iii) Bettger's releases, promises, and obligations contained herein.

(Id. ¶ 2.2). The agreement requires Bettger to provide Crossmark with an affidavit reiterating her understanding of the above terms; acknowledging that she is obligated to abide by Crossmark's time recording policies; and stating that she will properly record all time actually worked for Crossmark moving forward. (Id. ¶ 3.0).

In addition, the agreement contains the following release provision:

> For and in consideration of the covenants and/or promises contained herein, [Bettger] . . . hereby fully, finally, and forever RELEASES, ACQUITS, and DISCHARGES [Crossmark] . . . from, and covenants not to sue [Crossmark] . . . for any and all claims, demands, actions, causes of action, other liabilities, and/or damages, if any, known or unknown, whether arising at law, by statute, or in equity, which Bettger, or any other person or entity claiming by, through or under her, may have or claim to have, jointly or severally, against [Crossmark] that in any way arise out of or are connected with acts, omissions, conduct, relationships, occurrences, dealings, communications, events, and/or transactions that have occurred on or before the Effective Date, including, without limitation, the claims asserted in the <u>White</u> Lawsuit and/or <u>Postiglione</u> Lawsuit and any other contractual, constitutional, statutory, or common law or tort claims whatsoever, including, without limitation, any claims for wrongful discharge or termination or violations of any state or federal law which provides civil remedies for the enforcement of rights arising out of the employment relationship, including claims under Title VII of the Civil Rights Act of 1964, . . . Americans with Disabilities Act, . . . Age Discrimination in Employment Act, . . . the Fair Labor Standards Act, . . . (specifically including the Equal Pay Act), . . . the Family and Medical Leave Act, . . . the Occupational Safety and Health Act, . . . the Sarbanes-Oxley Act of 2002; and the Employee Retirement Income Security Act, . . . as well as any claims arising out of or based upon any allegations seeking to recover wages, salary, commissions, bonuses, front or back pay, benefits, stock options, profit sharing interests, or any other such employee-related compensation or benefits, or based upon allegations of breach of contract, defamation, promissory estoppel, tortious interference, implied covenants, invasion of privacy, assault and battery[,] . . . false imprisonment, negligence[,] . . .and/or intentional or other infliction of emotional distress.

(<u>Id.</u> ¶ 4.1).  The agreement further details Bettger's considered waiver of any and all claims specifically arising under the Age Discrimination in Employment Act ("ADEA").  29 U.S.C. § 621 *et seq.*; (<u>id.</u> ¶ 4.2).  Therein, Bettger acknowledges that she has received consideration "in addition to anything of value to which she was previously entitled" in return for waiving all ADEA claims against Crossmark arising prior to the date of the

agreement's execution.  (Id.)  The provision allows Bettger seven days after the date of execution to revoke her waiver of ADEA claims.  (Id.)

Furthermore, in the section titled "Dismissal of Governmental Proceedings," Bettger "affirms that she has no charges of discrimination, harassment, and/or retaliation or any other claim pending with the Equal Employment Opportunity Commission, Pennsylvania Department of Human Rights, the Department of Labor, or other state or federal government agency against Crossmark."  (Id. ¶ 5.2). She agrees, however, that "[t]o the extent that any such charges exist, [she will] undertake all necessary efforts to withdraw the charge(s) and to dismiss any proceeding associated with such charge(s)."  (Id.)

Bettger also represents in the agreement that "she will not testify or submit an affidavit, declaration or affirmation in any other lawsuits involving [Crossmark], including, without limitation, any lawsuits initiated by persons who were named-plaintiffs or opt-in plaintiffs in the Postiglione Lawsuit unless required to do so by subpoena or court order."  (Id. ¶ 6.1).  Additionally, she "will not assist or work with any persons initiating any other lawsuits against [Crossmark], including, without limitation, any persons who were named-plaintiffs or opt-in plaintiffs in the Postiglione Lawsuit unless required to do so by subpoena or court order."  (Id.) Finally, the proposed settlement agreement provides that Bettger's counsel will file a stipulation of dismissal with prejudice no later than three business days after receiving the executed agreement from Crossmark.  (Id. ¶ 5.1).

### B.   *Bona Fide* Dispute

The court first addresses the threshold question of whether the parties'

agreement resolves a *bona fide* dispute.  Bettger asserts that Crossmark willfully

violated the FLSA by failing to compensate her for unreported overtime hours

between April 21, 2008[1] and March 26, 2009.[2]  (See Doc. 55 at 8-9).  Crossmark

responds that Bettger is not entitled to compensation under the FLSA for any

overtime that she failed to report.  (Id.)

An employee's FLSA claim is subject to a two-tiered statute of limitations:

two years for ordinary violations and three years for willful violations.  29 U.S.C.

§ 255(a).  To establish a willful violation, the employee must provide sufficient

evidence to indicate that the employer "either knew or showed reckless disregard"

as to whether its conduct was prohibited by the FLSA.  McLaughlin v. Richland

Shoe Co., 486 U.S. 128, 133 (1988).  Simple negligence on the part of an employer is

not sufficient to constitute a willful violation.  Id.

Better asserts that Swaggert directed her to refrain from reporting overtime

hours that she knew Bettger worked.  (Doc. 31-1, Ex. 1 at 190:5-8).  Bettger further

avers that Crossmark, through Swaggert's actions, willfully violated the FLSA as it

applies to Bettger's compensation.  (Doc. 55 at 9); see Stanislaw v. Erie Indemnity

---

[1] The statute of limitations was tolled when Bettger joined the putative collective action on February 9, 2011.  The statute of limitations restarted when she was dismissed from the collective action on November 14, 2012, until she filed her complaint in the instant case on January 24, 2013.  (See Doc. 13).  Thus, the three-year statute of limitations applicable to willful violations bars any claims for compensation accruing before April 21, 2008.

[2] Bettger's claim for wages ends at the March 26, 2009 pay period, when she transitioned from full-time to part-time status.  (Doc. 31 at 36).

Co., Civ. A. No. 07-1078, 2012 WL 517332, at *10 (W.D. Pa. Feb. 15, 2012) ("Courts

have consistently concluded that a violation is willful where an employer

intentionally discourages or inhibits employees from accurately reporting

overtime." (citing cases)).  Relying exclusively on her own estimate of total unpaid

work hours, (Doc. 38 at 18), at trial, Bettger would endeavor to prove $4,337.01 in

unpaid overtime wages between April 21, 2008 and March 26, 2009; this would

entitle her to $8,674.02 under § 216(b).  (See Doc. 55 at 9).

In response, Crossmark contends that Bettger is not owed compensation for

time spent performing unreported administrative tasks because Crossmark lacked

actual or constructive knowledge of this work.  (Doc. 27 at 10-13).  Subsequently,

Crossmark argues that, because any alleged violations were not willful, Bettger's

entire claim period falls outside of the applicable two-year statute of limitations

period.[3]  (Id. at 13-14).  Crossmark further contends that, even under the three-year

statute of limitations applicable to willful violations, Bettger lacks any meaningful

record of the "amount or extent of unpaid time she supposedly worked."  (Doc. 27 at

15-16).

Relying on the foregoing arguments, the parties aver that their agreement

settles a *bona fide* dispute, as there is a reasonable possibility that Bettger would

not prevail at trial.  (Doc. 55 at 9); see Lynn's Food Stores, 679 F.2d at 1354; Deitz,

2013 WL 23338496, at *3; Collins, F. Supp. 2d at 719-20.  The court agrees.  Indeed,

upon consideration of Crossmark's motion for summary judgment, the court noted

---

[3] The time period applicable to Bettger's claim ends at the pay period of
March 26, 2009, and the two-year statute of limitations governing ordinary FLSA
violations bars any claims for compensation accruing before April 21, 2009.

that although "a jury *could* . . . reasonably find that Crossmark, through Swaggert's actions, willfully violated the FLSA," Bettger's claim is "marginal at best." (Doc. 38 at 21 (emphasis added)).  As explained *supra*, at trial, Bettger would be required to establish that Crossmark *willfully* violated the FLSA, and it is unclear from the record whether Swaggert's comments evidence a knowing violation on the part of Crossmark.  (See Doc. 31-1, Ex. 1 at 134:23-24).  Bettger would also be required to prove the extent and amount of her damages by a preponderance of the evidence. Bettger relies principally upon estimates of the number of extra administrative hours she worked to support her claim for $4,337.01 in unpaid overtime wages. (Doc. 38 at 18).  She otherwise lacks corroborative evidence of these extra hours.  In sum, both the factual underpinnings of Bettger's claims and Bettger's legal right to FLSA coverage are debatable on the present record.  Hence, the court is satisfied that the instant settlement facilitates the compromise of a *bona fide* dispute, rather than the "mere waiver of statutory rights brought about by an employer's overreaching."  Lynn's Food Stores, 679 F.2d at 1354.

### C.    Fair and Reasonable Settlement

The court will next determine whether the settlement agreement proposed by the parties is fair and reasonable to Bettger.  In undertaking this analysis, district courts within the Third Circuit have considered the factors set forth in Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), which established evaluative criteria for the fairness of proposed class action settlements.  See, e.g., McGee, 2014 WL 2114582, at *2; Brown, 2013 WL 5408575, at *2; Deitz, 2013 WL 23338496, at *5-8;

Altenbach, 2013 WL 74251, at *2; Brumley, 2012 WL 1019337, at *4-5.  Girsh directs

courts to examine the following nine factors:

> (1) the complexity, expense, and likely duration of the litigation; (2) the
> reaction of the class to the settlement; (3) the stage of the proceedings
> and the amount of discovery completed; (4) the risks of establishing
> liability; (5) the risks of establishing damages; (6) the risks of
> maintaining the class action through the trial; (7) the ability of the
> defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible
> recovery; and (9) the range of reasonableness of the settlement fund to
> a possible recovery in light of all the attendant risks of litigation.

Girsh, 521 F.2d at 157-58 (citation omitted).

Applying the appropriate Girsh factors to the matter *sub judice*, the court is

satisfied that the agreement reaches a fair and reasonable compromise between the

parties.  Significantly, the cost of litigating has already outpaced the monetary value

of Bettger's claims.  See *In re* Cendant Corp. Litig., 264 F.3d 201, 233 (3d Cir. 2001)

("This factor captures the probable costs, in both time and money, of continued

litigation." (internal quotation marks omitted)).  Bettger's maximum possible

recovery is $8,674.02, whereas, as of September 14, 2014, her attorneys' fees totaled

$43,277.50.  (Doc. 55 at 9, Ex. A).  Although this matter commenced as a putative

collective action, it can no longer be described as complex—a single plaintiff asserts

only one claim.  Even so, the relative expense of further litigation weighs strongly in

favor of settlement.

Furthermore, the court finds that the parties obtained an "adequate

appreciation of the merits before negotiating."  Deitz, 2013 WL 2338496, at *6

(quoting *In re* Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d

283, 318 (3d Cir. 1998)); cf. *In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods.

Liab. Litig., 55 F.3d 768, 814 (3d Cir. 1995) ("[T]he inchoate stage of case development reduces our confidence that the proceedings had advanced to the point that counsel could fairly, safely, and appropriately decide to settle the action."). Counsel for the parties completed fact discovery before fully briefing Crossmark's motion for summary judgment and motion *in limine*. (Docs. 26, 34). The court's subsequent rulings narrowed the scope of the lawsuit and precluded Bettger from introducing certain types of evidence at trial. (Doc. 38). Shortly after submitting pretrial memoranda, the parties commenced settlement discussions leading to the instant compromise. Considering the parties' awareness of the litigable issues at this advanced stage of the proceedings, the court has no doubt that the parties, as well as their respective counsel, appreciate the merits of the case.

Moreover, as discussed *supra*, the parties have clearly set forth the challenges that Bettger would face establishing liability and damages at trial. See Gen. Motors, 55 F.3d at 814 ("By evaluating the risks of establishing liability [and damages], the district court can examine what the potential rewards (or downside) of litigation might have been . . . ."). To accomplish this, Bettger would be required (1) to demonstrate that Crossmark *willfully* violated the FLSA and (2) to prove the amount and extent of her uncompensated overtime work. Given the relative paucity of evidence on these points, Bettger's success at trial is far from guaranteed.

Ultimately, if the litigation resolved in her favor, Bettger would obtain $8,674.02 in damages in addition to a full award of attorneys' fees and costs. Although Crossmark does not address its ability to withstand a judgment in excess

of its obligations under the proposed settlement, it notes that "it risk[s] an award of counsel fees substantially greater than the compromise amount should it go to trial and lose." (Doc. 55 at 10). Conversely, if Crossmark were to prevail, Bettger would be responsible for covering her attorneys' fees and costs, and her overtime work would be left uncompensated. These calculations are speculative at best, however, given the uncertain outcome if the case went to trial. See Gen. Motors, 55 F.3d at 806 ("This inquiry measures the value of the settlement itself to determine whether the decision to settle represents a good value for a relatively weak case or a sell-out of an otherwise strong case."). Under the terms of the proposed settlement, Bettger receives $6,597.09 in damages and $16,502.90 for attorney's fees and costs. Considering all of the applicable Girsh factors, and especially in light of the risks of proceeding to trial and the relative costs of continued litigation, the court finds that the proposed settlement is fair and reasonable.

### D.   Release of Claims Provisions

Finally, the court must determine whether the proposed settlement furthers or "impermissibly frustrates" the implementation of the FLSA in the workplace. Altenbach, 2013 WL 74251, at *1; see McGee, 2014 WL 2114582, at *2; Brown, 2013 WL 5408575, at *1; Dees, 706 F. Supp. 2d at 1241. Having carefully considered the terms of the agreement, the court finds that the overly broad release provisions are antithetical to the FLSA and therefore must be excluded. (See Doc. 55 Ex. C ¶¶ 4.1, 4.2, 5.2).

District courts reviewing proposed FLSA settlements may require litigants to limit the scope of waiver and release provisions to "claims related to the specific

litigation" in order to ensure equal bargaining power between the parties.

Singleton v. First Student Mgmt. LLC, Civ. A. No. 13-1744 JEI/JS, 2014 WL 3865853, at *8-9 (D.N.J. Aug. 6, 2014); see Brumley, 2012 WL 1019337, at *8 ("[W]orkers seeking to recover backpay may be willing to waive unknown claims in order to access wrongfully withheld wages as soon as possible. . . ."); Hogan v. Allstate Beverage Co., 821 F. Supp. 2d 1274, 1282 (M.D. Ala. 2011) ("[Pervasive release] provisions confer a partially offsetting benefit on the employer that is ancillary to the *bona-fide* dispute over FLSA coverage and wages due." (internal quotation marks omitted)); Moreno v. Regions Bank, 729 F. Supp. 2d 1346, 1351 (M.D. Fla. 2010) ("Although inconsequential in the typical civil case (for which settlement requires no judicial review), an employer is not entitled to use an FLSA claim . . . to leverage a release from liability unconnected to the FLSA."); cf. *In re* Wells Fargo Wage & Hour Emp't Practices Litig. (No. III), No. H-11-2266, 2014 WL 1882642, at *6 (S.D. Tex. May 12, 2014) ("[T]he release appropriately applies only to wage and hour claims and is thus not overly broad.").  In addition, the Third Circuit requires all waivers of employment discrimination claims to be made "knowingly and willfully" and directs courts to consider the totality of the circumstances when assessing the validity of such waivers.  Cuchara v. Gai-Tronics Corp., 129 F. App'x 728, 730-31 (3d Cir. 2005) (quoting Coventry v. U.S. Steel Corp., 856 F.2d 514, 522 (3d Cir.1988)). The relevant totality of the circumstances test is comprised of a list of factors, including "the clarity and specificity of the release language" and "whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or

law."[4] Cuchara, 129 F. App'x at 731 (quoting Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir. 1988)).

The court finds the release provisions inappropriately comprehensive; the provisions preclude Bettger from raising *any and all* claims she may have against Crossmark arising prior to the execution date of the agreement and require her to dismiss any charges of discrimination, harassment, or retaliation currently pending with any government agency.  These terms extend far beyond the pale of the FLSA claim *sub judice*.  The court has no information regarding the value of the released claims to the parties, and the parties fail to provide any explanation for the agreement's far-reaching waivers.  See Hogan, 821 F. Supp. 2d at 1284 ("[T]he waiver provision, if allowed, would have been extracted from [plaintiff] without any independent compensation for it, as far as the record shows.").  The parties assert that that the non-monetary terms of the settlement are reasonable in part because Bettger has no additional claims against Crossmark.  This assertion misses the mark entirely.  (Doc. 55 at 10 ("[T]he non-monetary terms of the settlement agreement are reasonable under all of the circumstances.  [Bettger] does not have

---

[4] The complete list of factors is as follows: "(1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time the plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law." Cuchara, 129 F. App'x at 731 (quoting Cirillo, 862 F.2d at 451).

any claim other than the instant wage claim.")). Under the release provisions as currently written, if Bettger discovers any potential cause of action arising from events that predate the agreement's execution, she will be barred from litigating against Crossmark. Thus, Bettger is precluded from raising any claims founded upon events taking place between commencement of her employment with Crossmark in 1999 and finalization of the instant agreement. Applying the exacting scrutiny mandated by the FLSA, the court is compelled to find that such a broad waiver impermissibly frustrates the implementation of an otherwise fair and reasonable settlement.

Furthermore, the court lacks sufficient information to properly evaluate whether Bettger's waiver of employment discrimination claims is made knowingly and willfully.[5] See Cuchara, 129 F. App'x at 730-31 (citing Coventry, 856 F.2d at 522). Although the agreement endeavors to address this point, the Third Circuit totality of the circumstances test requires more. (See Doc. 55 Ex. C ¶ 8.1 ("Bettger understands that by signing this Agreement, she is agreeing to all of the provisions set forth in the Agreement, and has read and understood each provision.")). For example, after reviewing the instant record, the terms of the settlement agreement, and the parties' supporting materials, the court is unaware of any "consideration given [by Crossmark] in exchange for the waiver . . . [that] exceeds the benefits to which [Bettger] was already entitled by contract or law." Cuchara, 129 F. App'x at

---

[5] The court notes that under the Older Workers Benefit Protection Act, 29 U.S.C. § 626, a heightened level of scrutiny applies to waivers of ADEA claims; each factor from the totality of the circumstances test *must* be satisfied, and the burden of proof lies with the employer. See Long v. Sears Roebuck & Co., 105 F.3d 1529, 1539 (3d Cir. 1997).

731 (quoting Cirillo, 862 F.2d at 451).  Hence, one factor from the Third Circuit

totality of the circumstances test weighs against the waiver's validity.  Id.

Additionally, although the agreement states that Bettger "has no charges of

discrimination, harassment, and/or retaliation or any other claim pending" with any

state or federal government agency, it requires her to withdraw any pending

charges to the extent that they exist.  (Doc. 55 Ex. C ¶ 5.2).  Ultimately, on the record

*sub judice*, the court cannot find that Bettger's release of employment

discrimination claims is knowing and voluntary.

In conclusion, the court is cognizant that the FLSA was enacted in part to

combat "inequalities in bargaining power between employers and employees."

Lynn's Food Stores, 679 F.2d at 1352 (citing Brooklyn Sav. Bank v. O'Neil, 324 U.S.

697, 706 (1945)).  Tasked with ensuring that implementation of the FLSA is

furthered, not frustrated, by the parties' agreement, the court cannot approve the

release provisions in their present form.  See Altenbach, 2013 WL 74251, at *1;

Brumley, 2012 WL 1019337, at *8; Hogan, 821 F. Supp. 2d at 1282-84; Moreno, 729 F.

Supp. 2d at 1351-52; Dees, 706 F. Supp. 2d at 1241.  Therefore, the court approves

only the provisions that release Crossmark from claims that fall within the ambit of

the FLSA and the Equal Pay Act and arise from the facts of the instant litigation;

the parties are directed to strike all additional terms of the release provisions from

paragraphs 4.1, 4.2, and 5.2 of the agreement.

**IV.   <u>Conclusion</u>**

For all of the foregoing reasons, the parties' joint motion (Doc. 55) for judicial approval of settlement will be granted in part and denied in part.  An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      January 22, 2015